No. 97-584

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 197

STATE OF MONTANA,

Plaintiff and Respondent,

v.

DIANNE ERETH,

Defendant and Appellant.

APPEAL FROM: District Court of the Eighth Judicial District,

In and for the County of Cascade,

The Honorable Marge Johnson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

J. Kim Schulke, Attorney at Law, Great Falls, Montana

For Respondent:

Hon Joseph P. Mazurek, Attorney General

Mark W. Mattioli, Ass't Attorney General, Helena, Montana

Brant S. Light, Cascade County Attorney, Great Falls, Montana

Submitted on Briefs: June 11, 1998

Decided: August 11, 1998

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

**¶1 Appellant Dianne Ereth (Ereth) appeals from the denial of her motion to withdraw her *Alford* plea and from her conviction in the Eighth Judicial District Court, Cascade County. We reverse and remand.**

**¶2 Ereth raises the following issues:**

**¶3 1. Did the District Court err in refusing to allow Ereth to withdraw her guilty plea?**

**¶4 2. Did the District Court err in ordering Ereth to pay $10,000 in restitution to the victims?**

**¶5 Because we find issue one dispositive, we will not address issue two.**

Factual and Procedural Background

**¶6 On August 31, 1994, Ereth was charged by information with three counts of sexual intercourse without consent and two counts of sexual assault, all felonies. The charges involved J.A., an eleven-year-old boy, and K.A., a nine-year-old girl. Ereth lived with J.A., K.A., and their mother for a period of time and babysat the children. The information alleged that Ereth fondled J.A.'s genitalia and penetrated K.A.'s vagina with her fingers and with a crochet hook. Ereth obtained representation from**

the Cascade Public Defender's Office.

¶7 In September of 1995, at the suggestion of one of her public defenders, Ereth underwent a "sex offender evaluation." She was evaluated by Lily Kravcisin (Kravcisin), a licensed professional counselor with InterConnections Counseling Group, Inc. (InterConnections). Kravcisin's evaluation indicated that Ereth was willing to undergo counseling and psychotherapy to determine whether she was repressing memories of the offenses.

¶8 On December 6, 1995, Ereth filed a signed plea agreement and a notice of acknowledgment and waiver of rights. The District Court issued an order stating that it would likely reject the agreement. Therefore, the State and Ereth entered into a second plea agreement. Under the terms of this agreement, Ereth agreed to enter an *Alford* plea to two counts of felony sexual assault. In return, the State agreed to recommend that Ereth receive a five-year sentence with three years suspended on each offense and to dismiss the two charges of felony sexual intercourse without consent and one felony assault charge. The agreement also stated: "The Court in it [sic] discretion may reject a waiver of the mandatory minimum for these charges and impose a sentence upon the Defendant of up to ten (10) years in the Montana State Prison with six (6) years suspended on both counts."

¶9 This agreement and Ereth's acknowledgment and waiver of rights were filed on February 5, 1996. Scott Albers (Albers), Chief Cascade Public Defender, wrote to the District Court, explaining that he could only convince Ereth to enter an *Alford* plea, not a guilty plea. Albers stated: "I do not believe that the defendant in this case is capable of admitting guilt. Although the facts of the case are against her the only plea which the defense will be able to bring forward is an Alford Plea."

¶10 After filing the plea agreement, Ereth began sex offender counseling with InterConnections. On April 12, 1996, the District Court held a change of plea hearing. At the hearing, Ereth testified that she understood the nature of the proceedings and had received ample counseling from the Public Defender's office regarding the options available to her. She described her understanding of an *Alford* plea as follows: "That I believe that the facts are overwhelming against me and I would be found guilty in a trial, but at this point I cannot admit to that guilt."

¶11 Ereth testified that when she entered the *Alford* plea, she was not sure whether

she committed the offenses charged. She stated:

> Just in talking with the other members of my group [her InterConnections counseling group], I have come to believe that there is a possibility I could have done this. And I truly want to find out if I did do this. And that is my main goal right now in therapy.

Further, when questioned by Albers, Ereth replied as follows:

> Q: Is it your belief at this time that you may have committed the offenses involved and simply have blocked them out of your memory?
>
> A: Yes, it is.
>
> Q: Do you feel that's a substantial possibility?
>
> A: Yes, it is.
>
> Q: And for that reason and that reason alone you're unable to lay a factual basis yourself that you subjected these children to sexual contact?
>
> A: Yes.

**¶12 Debra Baumgart (Officer Baumgart), a deputy with the Cascade County Sheriff's Department, testified regarding her videotaped interviews with J.A. and K.A. On the tape, J.A. and K.A. both describe being abused by Ereth. The State also introduced into evidence the report of Dr. Nancy Maynard, who performed a physical examination of the children. Dr. Maynard reported K.A. had vaginal tissue findings consistent with having been sexually abused.**

**¶13 Kravcisin also testified at the hearing. Kravcisin testified that Ereth was unable to remember the events surrounding this case, but that Ereth was horrified that she may have committed these crimes and wanted treatment. Kravcisin explained that she had been helping Ereth to explore her memory on both a conscious and unconscious level and that Ereth was close to "realizing" that she had abused J.A. and K.A. When asked by the District Court whether she had concerns about implanting false memories through hypnosis, Kravcisin replied, "I believe that for an untrained therapist, that a therapist can interogenically place into a client a**

memory . . ." but explained how the method she employed avoided implanting false memories.

¶14 Ereth then pled guilty to two counts of sexual assault and pled not guilty to one count of sexual assault and two counts of sexual intercourse without consent. The District Court entered the pleas and set sentencing for July 23, 1996.

¶15 On July 19, 1996, Ereth filed a motion to withdraw her guilty pleas. In an attached affidavit, Ereth stated that she had always been uncomfortable about pleading and that through counseling, she had come to the "clear understanding" that she did not do the crimes with which she was charged. A hearing was held on the motion in October of 1996. Kravcisin again testified at the hearing. She stated that Ereth had not received treatment since July 1996. When asked by the District Court if she still believed that Ereth had suppressed a memory of committing the abuse, Kravcisin replied: "I don't know quite frankly if she's suppressed it or not. I believe there's a possibility that she could have. I have not yet, in the work that I've had with her, found that suppression."

¶16 Ereth testified that she had never been comfortable with the plea. She stated that Albers had told her if she went to trial, she would go to prison, and that she thought that a jury would never believe that she did not commit the crimes. She stated that when she entered the plea, she did not believe that she was guilty of the crimes charged and did not understand that an *Alford* plea was an admission of guilt.

¶17 Regarding her therapy with Kravcisin, Ereth testified that she had entered therapy on the advice of Albers -- "On the chance that I had committed these crimes and had repressed it, the therapy would, would let me know that I had -- you know, it would bring that out if I had committed it." However, she testified that she never reached a point in therapy where she believed she had committed the offenses. Ereth stated that in May of 1996, she attempted suicide and, after being released from the hospital, told Kravcisin that she could no longer live with the fact that she had pled guilty to something she did not do.

¶18 The District Court denied Ereth's motion, holding that Ereth had entered her plea voluntarily and intelligently. The court found that Ereth knew what she was doing when she entered her plea and had simply changed her mind. The District Court set sentencing for March 20, 1997 and ordered Ereth to undergo a psychiatric

**evaluation to determine, for purposes of sentencing, whether she was suffering from a mental disease or defect.**

**¶19 Ereth was evaluated by Dr. John Mendenhall (Dr. Mendenhall). Dr. Mendenhall filed a report with the District Court on March 18, 1997. Dr. Mendenhall found that, unlike most female sex offenders, Ereth does not suffer from a psychotic disorder. He found that Ereth "suffers from no dissociative or other mental disorder which statutorily or psychiatrically ought to give pause to the Court in passing sentence."**

**¶20 Dr. Mendenhall also sent a letter to the court, outlining the concerns he had about the treatment program at InterConnections. Dr. Mendenhall stated:**

> The reports from InterConnections Counseling are based on non-scientific tenets. The methods used by that facility are not scientifically valid. The contentions of that facility that hypnosis can be useful in cases of this sort are dead wrong, known to be dead wrong, and are disavowed by every reputable professional organization in the field of mental health.
>
> The contention of Lily Kraviscin [sic] that false memories can be implanted is correct. Her further contention that they cannot be implanted, by virtue of her advanced methods of hypnosis, by her, is not. . . . The implantation of false memories is, actually, quite easy. . . . 25% of normal adult research probands can be made to believe, without hypnosis, without therapy, after a single exposure to a single oral story, that they personally experienced the events of the story. This number, in children, by the bye, approaches 100%.
>
> . . . .
>
> The notion that Dianne Ereth, or anybody else, may have committed sexual crimes and "repressed" their memory is unsupported by scientific evidence. There is no credible evidence that repression of memory of being the victim of sexual abuse can happen, much less for being the perpetrator. Even those who make their livings in the sexual abuse industry, in the face of scholarly research raising very serious questions about any human ability to "repress memory," have largely abandoned the idea of "repressed memory."

**¶21 On March 19, 1997, the day before sentencing was to be imposed, Ereth moved**

the court to reconsider her motion to withdraw her guilty pleas based on Dr. Mendenhall's opinions. She also alleged that she had been coerced into the entry of the guilty plea by her counsel from the Public Defender's Office. Eric Olson, a Deputy Public Defender, moved to withdraw. The court held a hearing at which Dr. Mendenhall testified about his findings and opinions regarding InterConnections. The District Court granted counsel's motion to withdraw and stated that it would allow further briefing and a hearing on whether Ereth should be allowed to withdraw her *Alford* plea. J. Kim Schulke was appointed to represent Ereth.

¶22 A hearing was held on April 30, 1997. Ereth testified that Kravcisin had told her that only two percent of children who allege they have been sexually assaulted are lying and that it was likely that Ereth was simply repressing the memory. She stated that she was never informed by Albers or Kravcisin that, in the medical community, controversy surrounds the retrieval of repressed memories nor that it was not standard treatment. Ereth testified that had she known the information contained in Dr. Mendenhall's letter and report, she never would have entered the pleas. She admitted, however, that she had agreed to plead guilty prior to starting counseling with InterConnections.

¶23 At the conclusion of the hearing, the District Court denied Ereth's motion to withdraw her guilty plea. On June 13, 1997, Ereth was sentenced to a term of five years, with three years suspended on each of the two counts, with the terms to be served consecutively. The court also ordered her to pay $10,000 restitution to the victims.

## Standard of Review

¶24 We review a district court's denial of a motion to withdraw a guilty plea for abuse of discretion. State v. Enoch (1994), 269 Mont. 8, 11, 887 P.2d 175, 177. We have held that the district court need not apply a particular rule or standard to determine whether to allow a defendant to withdraw his or her plea, but rather must consider each case "in light of its unique record." Enoch, 269 Mont. at 11, 887 P.2d at 177 (citing State v. Radi (1991), 250 Mont. 155, 818 P.2d 1203).

## Discussion

¶25 We balance three factors when considering a criminal defendant's attempt to

withdraw a guilty plea: (1) the adequacy of the court's interrogation at the time the plea was entered regarding the defendant's understanding of the consequences of the plea; (2) the promptness with which the defendant attempts to withdraw the plea; and (3) the fact that the plea was the result of a plea bargain in which the guilty plea was given in exchange for dismissal of another charge. Enoch, 269 Mont. at 11-12, 887 P.2d at 177.

¶26 We have held that a plea is adequate where the court:

> "examines the defendant, finds him to be competent, and determines from him that his plea of guilty is voluntary, he understands the charge and his possible punishment, he is not acting under the influence of drugs or alcohol, he admits his counsel is competent and he has been well advised, and he declares in open court the fact upon which his guilt is based."

Enoch, 269 Mont. at 13, 887 P.2d at 178 (quoting State v. Mahoney (1994), 264 Mont. 89, 870 P.2d 65). In addition, "it is well-settled that a guilty plea must be a knowing and intelligent choice among the alternative courses of action open to the defendant." Enoch, 269 Mont. at 13, 887 P.2d at 178 (citations omitted).

¶27 Thus, the purpose of inquiring into the adequacy of the court's interrogation is to ensure that the defendant has been well advised and that he/she entered the plea knowingly, intelligently, and voluntarily. The United States Supreme Court has held that a plea of guilty must represent "a voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford (1970), 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162. This Court will deem a guilty plea involuntary where it "appears that the defendant was laboring under such a strong inducement, fundamental mistake, or serious mental condition that the possibility exists that [s]he may have plead guilty to a crime of which [s]he is innocent." State ex rel. Gladue v. Eighth Judicial Dist. (1978), 175 Mont. 509, 511, 575 P.2d 65, 66.

¶28 In this case, the District Court's interrogation of Ereth at the change of plea hearing was substantial. Further, in deciding Ereth's motion to withdraw and motion for reconsideration, the court held three hearings at which it heard the testimony of Ereth and several other witnesses. The District Court followed the proper statutory procedure at the change of plea hearing, and Ereth testified that she had signed and understood an acknowledgment and waiver of rights. However, Ereth argues that

because she was under the mistaken assumption that she may have committed the offenses for which she was charged and she would, through therapy with Kravcisin, be able to recover memories of the offense, her *Alford* plea was not a voluntary, knowing and intelligent choice. Despite the lengths to which the District Court went to ensure that Ereth understood the consequences of the *Alford* plea, Ereth was not well advised. We agree with Ereth that her plea was not voluntarily, intelligently and knowingly made.

¶29 Dr. Mendenhall testified that "[t]he contentions of [InterConnections] that hypnosis can be useful in cases of this sort are dead wrong, known to be dead wrong, and are disavowed by every reputable professional organization in the field of mental health." Dr. Mendenhall told the District Court that "[t]he notion that Dianne Ereth, or anybody else, may have committed sexual crimes and 'repressed' their memory is unsupported by scientific evidence." However, when the District Court asked Kravcisin about the validity of repressed memory therapy, Kravcisin indicated that such therapy could be dangerous in the hands of untrained persons, but not in her own. Kravcisin told the court that she believed that Ereth wanted to remember her abuse of J.A. and K.A. and was close to "realizing" that she had committed the crimes.

¶30 Throughout the country, mental health professionals and courts alike are condemning the use of repressed memory therapies such as those used by InterConnections. See Julie M. Kosmond Murray, Comment, Repression, Memory, and Suggestibility: A Call for Limitations on the Admissibility of Repressed Memory Testimony in Sexual Abuse Trials, 66 U. Colo. L. Rev. 477 (1995); Douglas R. Richmond, Bad Science: Repressed and Recovered Memories of Childhood Sexual Abuse, 44 U. Kan. L. Rev. 517 (1996). However, our purpose here is not to discredit Kravcisin or her theory, but merely to suggest that with knowledge of the substantial amount of controversy which surrounds repressed memory therapy or of Dr. Mendenhall's opinion that sexual abusers do not repress memories of their crimes, Ereth may have chosen not to enter her plea. However, Ereth was never told of the problems with InterConnections' methods. Rather, she entered therapy on the advice of counsel. Further, Ereth was told by Kravcisin that because only two percent of children lie about being assaulted, it was likely that she was repressing memories of assaulting J.A. and K.A. and needed to recover those memories so she could get well.

¶31 At the change of plea hearing, Ereth testified that she could not recount the facts

surrounding the sexual assault of J.A. and K.A. because, although she believed there was a substantial possibility she may have committed the offenses, she must have blocked them out of her memory. She testified that, "in talking with the other members of my group, I have come to believe that there is a possibility I could have done this."

¶32 The State contends that Ereth entered the plea simply because she knew that if she went to trial, a jury would convict her. The State points out that at the change of plea hearing, Ereth testified: "I believe that the facts are overwhelming against me and I would be found guilty in a trial. . . ." It is possible that Ereth entered an *Alford* plea simply because she thought the State had overwhelming evidence to convict her and then, after changing her mind, sought to withdraw the plea. However, it is also possible that Ereth truly believed that she had repressed any memory of committing the offenses for which she was charged and hoped, through therapy with InterConnections, she would be able to recover those memories and get help. We have held that "if there is any doubt that a guilty plea was not voluntarily or intelligently made, the doubt must be resolved in favor of the defendant." Enoch, 269 Mont. at 18, 887 P.2d at 181. Given the role that repressed memory therapy played in Ereth's decision-making process and given the air of uncertainty regarding the validity of this therapy, there is at least doubt as to whether Ereth's *Alford* plea was entered voluntarily. Thus, we determine that Ereth's pleas were not voluntarily, knowingly and intelligently made and that the first consideration set forth in Enoch, 269 Mont. at 11-12, 887 P.2d at 177, weighs in Ereth's favor.

¶33 The second consideration under Enoch, 269 Mont. at 12, 887 P.2d at 177, is the promptness with which the defendant attempted to withdraw the pleas. "Because each case presents its own unique factual circumstances, we have declined to adopt specific parameters defining the timeliness of a motion to withdraw." Enoch, 269 Mont. at 12, 887 P.2d at 178. In this case, Ereth filed her signed plea agreement and waiver of rights on February 5, 1996 and began counseling with InterConnections that month. The change of plea was entered on May 9, 1996. Ereth filed her notice of withdrawal of guilty plea on July 19, 1996, a few days before the date on which sentencing was set and ceased further counseling with InterConnections. Apparently, Ereth determined that the repressed memory therapy was not working within that period of time and promptly moved to withdraw her plea. We determine that, given the unique factual circumstances of this case, Ereth's motion was filed in a reasonably prompt manner. Thus, this factor weighs in favor of allowing Ereth to

**withdraw her plea.**

**¶34 The third factor, whether the plea was given in exchange for dismissal of another charge, weighs against Ereth. The State agreed to dismiss two counts of sexual intercourse without consent and one count of sexual assault and waive the mandatory minimum sentence for the remaining charges in exchange for Ereth's *Alford* plea. However, since we have determined that Ereth's plea was not voluntarily, knowingly and intelligently made, we hold that the District Court abused its discretion in refusing to allow Ereth to withdraw her *Alford* plea.**

**¶35 Ereth also argues that the District Court erred in refusing to allow her to withdraw her plea because she received ineffective assistance of counsel. Because we hold that the District Court abused its discretion in refusing to allow Ereth to withdraw her plea, we will not address this argument.**

**¶36 Based on the foregoing, we reverse and remand.**

/S/ W. WILLIAM LEAPHART

We concur:

 /S/ J. A. TURNAGE

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

/S/ WILLIAM E. HUNT, SR.

 Justice James C. Nelson dissents.

**¶37 I respectfully dissent from the Court's determination that Ereth's pleas were not voluntarily, intelligently and knowingly made. In my view they were, and, accordingly, I would affirm the decision of the District Court denying Ereth's motion to withdraw her guilty pleas. First, it is necessary to review the pertinent trial court proceedings and the record.**

**¶38 At her change of plea hearing, Ereth testified that she spent considerable time**

discussing the proceedings against her with her counsel, Scott Albers. She stated that she had ample opportunity to obtain legal counsel and understood the alternatives available to her. She testified that she read the acknowledgment of waiver of rights with the help of her attorney and that she signed the waiver. She stated that she was not under the influence of alcohol or drugs. She testified that she had been fully apprised of the negotiations with regard to the plea agreement.

¶39 In explanation of her decision to enter the Alford plea, Ereth testified:

> at this present time I do not wish to enter--do not wish to say that I did do this, but I feel that if this were to go to trial at this point, that the facts are overwhelming against me and it would result in a guilty verdict.

On being asked if she wished to proceed with her change of plea, she stated that she wished to proceed.

¶40 After receiving evidence regarding the children's statements and videotaped interviews and Dr. Maynard's physical examination findings substantiating sexual abuse, Albers questioned his client. Ereth testified that she had "no doubt" that she would be convicted if a jury believed the evidence introduced at the change of plea hearing. In response to her counsel's inquiry about whether she understood the Alford pleas, she testified:

> I believe that the facts are overwhelming against me and I would be found guilty in a trial, but at this point I cannot admit to that guilt.

¶41 Ereth then testified that she understood that she could receive a ten-year prison sentence; that she understood the severity of the situation; and that she would be required to register as a sex offender. She also stated that she wished to avoid going to trial:

> Q. [By Mr. Albers] Now, you are entering this plea, as I understand it, because you wish to avoid the trial at all costs?
>
> A. Yes, I do.
>
> Q. Could you explain to the what you consider to be the eventual outcome of

a trial?

A. The eventual outcome, I believe at this point [is] that I would be found guilty.

**¶42 Ereth also testified with respect to Ms. Kravcisin's evaluation:**

Q. [By Mr. Albers] That evaluation is of concern to me because it would indicate for the Court that you may not have committed this crime.

A. Yes.

Q. That report indicates that you do not come from a family that has a heavy history of sexual abuse.

A. Right.

Q. It also has a number of statements from family members which would deny the fact that you possibly could have done this?

A. Yes.

Q. It's my understanding that your horror of the crime that is charged and your terror of possibly going to prison are the two principal things motivating this plea at this time?

A. Yes.

Q. And that this is the best option that you can come up with or that I've been able to offer or any attorney has been able to offer to keep you out of prison?

A. Yes.

Finally, Mr. Albers asked if Ereth believed she was probably guilty, to which she responded, "Yes."

**¶43 Following Ms. Kravcisin's testimony Ereth pleaded "guilty" to Counts I and V and "not guilty" to the remaining three counts of the information. Judge Johnson**

accepted Ereth's Alford pleas and ordered a presentence investigation.

¶44 At the hearing on Ereth's motion to withdraw her pleas, although she stated that she was not comfortable with the plea and was never happy with it, she nevertheless maintained that she personally believed a jury would not believe her and that she would be convicted. Moreover, on cross examination by the county attorney, Ereth admitted her plea was made freely and voluntarily; that she understood the consequences of her plea; that she suffered from no mental disability; that she believed she would be found guilty; and that she never informed anyone at the change of plea hearing that she was under undue influence or duress. Furthermore, she admitted that she indicated satisfaction with her attorneys at her change of plea hearing.

¶45 In denying Ereth's motion to withdraw her plea, Judge Johnson stated that she had no question that Ereth "knew what she was doing." Judge Johnson also noted that Ereth was "intelligent" and simply changed her mind. The court observed that there was no indication that Ereth's pleas of guilty were anything but a voluntary and intelligent assessment of her situation and that it was this assessment of the charges and evidence presented which prompted her entry into a very beneficial plea agreement. The judge found that Ereth was simply "unhappy with the result of her choices." I agree with the trial court's appraisal.

¶46 The majority opinion concentrates almost entirely--and erroneously, in my estimation--on Ereth's claim that she pleaded guilty under pressure from her attorney and on the basis of questionable repressed memory therapy. I cannot agree. As we pointed out in *State v. Enoch* (1994), 269 Mont. 8, 887 P.2d 175, "a guilty plea must be a knowing and intelligent choice among the alternative courses of action open to the defendant." *Enoch*, 269 Mont. at 13, 887 P.2d at 178. *See also North Carolina v. Alford* (1970), 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162.

¶47 The record in this case indicates that Ereth chose to plead guilty because that alternative course of action was the one most likely to keep her out of a lengthy prison sentence. Given Ereth's testimony at the various hearings regarding her change of plea, as referenced above, there is simply no merit to her claim that she was pressured by her attorney to plead guilty or that her pleas were somehow induced by her misapprehension of the repressed memory therapy in which she participated. In point of fact, her own testimony clearly indicates that her motivation

for pleading guilty was simply to avoid a jury trial and the possibility of a lengthy period of incarceration for her crimes. Ereth stated on several occasions during the change of plea hearing that the "facts were overwhelming" against her and that she had "no doubt" that a jury would convict her. In truth, even under her own assessment of her situation, she had few viable options available except to plead guilty.

¶48 We have recognized that a plea is not involuntary simply because it was entered to avoid the possibility of a greater punishment had the case gone to trial. *State v. Milinovich* (1994), 269 Mont. 68, 71, 887 P.2d 214, 216 (citing *Brady v. United States* (1970), 397 U.S. 742, 751, 90 S.Ct. 1463, 1470, 25 L.Ed.2d 747). Moreover, Ereth's unwillingness to admit her guilt, either then or now, is not a basis for allowing her to withdraw her pleas.

> [A]dmission of guilt . . . is not a constitutional requisite to the imposition of criminal penalty. An individual accused of a crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime.

*Alford*, 400 U.S. at 37, 91 S.Ct. at 167. Similarly, Ereth's dissatisfaction with her previous decision is not a valid reason to allow her to go back on her plea agreement where the record clearly and unequivocally shows that her pleas were knowingly, voluntarily and intelligently made at the time.

¶49 The majority acknowledges the three-factor test which this Court utilizes in reviewing a district court's denial of a criminal defendant's attempt to withdraw a guilty plea. *Enoch*, 269 Mont. at 11-12, 287 P.2d at 177. Indeed, in considering whether the court's interrogation of Ereth was adequate, the majority concludes that Judge Johnson's interrogation was "substantial" and that she followed the proper statutory procedures at the change of plea hearing. Furthermore, we note that in deciding Ereth's motion to withdraw and motion for reconsideration the court held three hearings at which it heard the testimony of Ereth and other witnesses. Nonetheless, in spite of this record, we conclude that Ereth's plea was not voluntarily, intelligently and knowingly made. In coming to this conclusion we improperly substitute our judgment for that of the District Court's, purely and simply.

¶50 In my opinion, Judge Johnson, in the proper exercise of her discretion, refused to contravene Ereth's obviously voluntary pleas. The District Court thoroughly examined Ereth and found her not only to be competent but intelligent. Judge Johnson determined that Ereth's pleas were voluntary even though she would not admit to her guilt; that she understood the charges and potential punishment; that she understood the rights she was waiving; that she was not under the influence of drugs or alcohol; and, that she was satisfied with her attorneys. The District Court, having heard the testimony and having judged Ereth's credibility, was certainly in the best position to determine whether her pleas were knowing, intelligent and voluntary. This Court, on the record here, has no business interfering with Judge Johnson's decision. *See State v. Hilton* (1979), 183 Mont. 13, 19, 597 P.2d 1171, 1174.

¶51 Ereth's choice to plead guilty was an intelligent choice among alternative courses of action--she could go to trial, be convicted on the "overwhelming evidence" of her guilt and spend a substantial number of years behind bars or, alternatively, she could plead guilty and guarantee dismissal of some of the charges against her and a more favorable prison sentence. She, wisely, chose the latter.

¶52 I would hold that the District Court did not abuse its discretion in denying Ereth's motion to withdraw her guilty plea and, accordingly, I would affirm Judge Johnson's decision. I respectfully dissent from our failure to do so.

/S/ JAMES C. NELSON

Justice Karla M. Gray joins in the foregoing dissent.

/S/ KARLA M. GRAY